### UNITED STATES v. KING.

*(Circuit Court, S. D. Alabama.   February 21, 1885.)*

SEAMEN'S WAGES—SECTION 10 OF THE ACT OF JUNE 26, 1884.
    The provisions of this section do not apply to steam-boats engaged in trade and navigating the inland waters of the United States.

Criminal Information for violation of section 10 of act of June 26, 1884.

The case is tried by the court upon the following agreed statement of facts, viz.:

It is agreed that H. Clay King was clerk of the steam-boat Mary, a vessel of 328 tons burden, which navigated the waters of the Mobile and Alabama rivers, from Mobile to Montgomery and back again, making trips once a week; that said waters are navigable, and within the admiralty and maritime jurisdiction of the United States; that on, to-wit, the thirtieth of September, 1884, the said King, as clerk of said boat, for the master thereof, did pay to Henry C. Thrower, who was acting for, or in copartnership with, John H. Wallace, 25 cents for each of the crew of said vessel shipped on board of said vessel at the time aforesaid for a trip on board said steam-boat from Mobile to Montgomery and return, whose names are mentioned in the criminal information in this case; that the manner of shipping the crew of said vessel is as follows: The said Thrower and said Wallace have an office on Front street, in Mobile,

the home port of said steam-boat, in which they keep blank contracts for the shipment of the crews or deck hands of steam-boats plying the waters of the Alabama, Tombigbee, and Warrior rivers, two of which rivers are navigable in the state of Alabama, and the other, the Tombigbee, in the adjoining state of Mississippi; that on the day aforesaid the mate of the said steam-boat Mary brought in person, or sent, with a strip of paper from the mate, which identified the person, the crew or deck hands to the office of said Thrower and Wallace to sign them up, by which he meant that the said Thrower should sign their names when they could not write, and to let them sign them when they could, to the contract between the said master of said vessel and the said deck hands for said trip or voyage. The said Thrower did let them sign, or signed for them, the said contract, and then the captain or master of said vessel, by himself or by one of the officers of said boat for him, signed the said contract, and the said Thrower signed his name to said contract as a witness. It is also agreed that the said contract shall be brought into the court and made an exhibit to the court. It is also agreed that said Thrower and Wallace, at the request of the masters of said vessels, keep a register or list of the names of the seamen or deck hands against whom any captain of said boats may have complained for desertion or general misconduct on the boats, and that, by an agreement between the captains of all the boats, men whose names are on the said list are not to be allowed to sign said contracts for any steam-boat plying said rivers, unless the captain who made the complaint withdraws his complaint, or the captain who wants to ship the man comes and requests it. It is also agreed that said Thrower and Wallace receive 25 cents for each seaman or deck hand who signs said contract and is accepted. Sometimes, after a larger crew has signed than is wanted by the captain, at the captain's request some of the names are stricken out, for which men so stricken out the 25 cents per man is not paid.

*George M. Duskin,* U. S. Atty., for the United States.
*R. Inge Smith,* for the U. S. Shipping Commissioner.
*M. B. Kelly,* for defendant.

BRUCE, J. This is a criminal information against the defendant, charging him with a violation of section 10 of the act of congress, approved June 26, 1884, known as the "Dingley Bill." The act is entitled "An act to remove certain burdens on the American merchant marine, and encourage the American foreign carrying trade, and for other purposes." Section 10 of the act provides "that it shall be, and is hereby, made unlawful in any case to pay any seaman wages, before leaving the port at which such seaman may be engaged, in advance of the time when he has actually earned the same, or to pay such advance wages to any other person, or to pay any person, other than an officer authorized by act of congress to collect fees for such service, any remuneration for the shipment of seamen. Any person paying such advance wages or such remuneration shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than four times the amount of the wages so advanced or remuneration so paid, and may be also imprisoned for a period not exceeding six months, at the discretion of the court. * * * "

There is an agreed statement of facts in the case, and it is insisted by the prosecution that the facts show a shipment of seamen, within the meaning of the act, on the steamer Mary, navigating the Alabama

river, by one Thrower, as the agent of one Wallace, neither of them being shipping commissioners, or master or owners of the boat, and a remuneration of 25 cents per seaman so shipped, paid by the defendant, King, as clerk of the steam-boat Mary, in violation of section 10 of the act quoted, *supra*.

It is not necessary to recite here in full the agreed statement of facts in the case; but it shows the existence of an understanding or agreement between Wallace and the masters of steam-boats navigating the Alabama and Tombigbee rivers from Mobile, as their home port, and return; that the seamen or deck hands employed on said boats are engaged by Wallace, who keeps an office on Front street, and has blank agreements prepared, to which he secures the signatures of the hands whom he engages, and keeps a record of those with whom the masters of steam-boats may have had trouble and difficulty; and for each seaman so engaged or employed for a trip or voyage the masters pay 25 cents. This arrangement is a voluntary one, depending for its existence and continuance upon the assent of the parties, and is not binding upon the hands only so far as, in its practical operation, it is the means of securing employment. It is not claimed that any law exists which requires the masters of these boats to have the services of a shipping commissioner or any other person in obtaining and engaging a crew for a voyage, nor is there any law requiring the seamen to be employed or shipped under the superintendence of a shipping commissioner or any person whatever; nor is it claimed as a fact that any charge at all is made by the masters of the steam-boats against the hands for the services paid for by them for the engaging and shipping of crews. This arrangement, by which the masters of steam-boats obtain, for a consideration, the assistance of persons in obtaining and shipping deck hands, is held to be in violation of the statute. It is not claimed that the masters may not ship their hands themselves; but the proposition is that if they require assistance of agents or persons other than themselves, that they must procure the services of a regularly appointed shipping commissioner to superintend and ship their men, so that the rights and interests of the men may be protected, as well as that of the masters of the boats, and that this was the object of congress in the enactment of this tenth section of this Dingley bill. It may admit of doubt whether the arrangement indicated and more fully set out in the agreed statement of facts in the case as to the manner in which crews are obtained and engaged for river steamers, constitutes in effect, or can be considered, a *shipment of seamen*, within the meaning of the act under consideration; and I do not discuss that question further, because, even if it is so, the first and controlling question here is whether this law has any application at all to the shipment of seamen (deck hands) on steam-boats navigating rivers such as the Alabama, Tombigbee, and Warrior.

The language of section 10, quoted *supra*, is broad and sweeping,

and if it stood alone it might be held that congress intended by it to go a step further than it had ever done before, and embrace within it cases such as the one at bar. Such, however, does not seem to have been the purpose of congress in the passage of the act of June 26, 1884. As already observed, it is an act entitled "An act to remove certain burdens on the American merchant marine." A reference to the former acts of congress upon the subject throws light upon the scope and purpose of congress in the passage of this last act which we are now considering. The act of congress of June 7, 1872, "to authorize the appointment of shipping commissioners by the several circuit courts of the United States, to superintend the shipping and discharge of seamen engaged in merchant ships belonging to the United States, and for the further protection of seamen," invested shipping commissioners with many and important functions. Section 12 of this act provides that the master of every ship bound from a port in the United States to any foreign port, or of any ship of the burden of 75 tons or upwards, bound from a port on the Atlantic to a port on the Pacific, or *vice versa*, shall, before he proceeds on such voyage, make an agreement in writing or in print with every seaman whom he carries to sea as one of the crew, in the manner hereinafter specified;   *   *   * and by the next section this agreement must be signed by each seaman in the presence of a shipping commissioner, who shall certify the same.

By act of January 15, 1873, congress limited section 12 of the former act, and provided that the section should not apply to masters of vessels when engaged in trade between the United States and the British North American possessions, or the West India islands, or the republic of Mexico. But the operation of the shipping commissioners' act—that is, the act of June 7, 1872—was limited in a most decided manner by act of congress of June 9, 1874, which provided, that "*none of the provisions* of an act entitled 'An act to authorize the appointment of shipping commissioners by the several circuit courts of the United States, to superintend the shipping and discharge of seamen engaged in merchant ships belonging to the United States, and for the further protection of seamen,' shall apply to sail or steam vessels engaged in the coastwise trade, except the coastwise trade between the Atlantic and Pacific coasts, or in the lake-going trade touching at foreign ports, or otherwise, or in the trade between the United States and British North American possessions, or in any case where the seamen are by custom or agreement entitled to participate in the profits or result of a cruise or voyage."

The effect of this act was not only to cut off the operation of the act of June 7, 1872, as to vessels in the coastwise trade, with the exceptions named,—that is, that in the shipping of seamen the agreements of masters with the seamen need not be signed under the superintendence of a shipping commissioner,—but it swept away all the penal provisions of the act in so far as they applied to vessels in

the coastwise trade, with the exceptions named in the repealing act. These penal provisions were for the protection of seamen. One of them, in section 8 of the act, provided "that any person, other than a commissioner under this act, who shall perform, either directly or indirectly, the duties which are by this act set forth as pertaining to a shipping commissioner, shall incur a penalty of not exceeding five hundred dollars."

The repeal of this and other penal provisions of the commissioners' act of June 7, 1872, shows that it was the purpose of congress to release masters of vessels in the coastwise trade, with the exceptions named, of the necessity of shipping their seamen under the superintendence of a shipping commissioner, and to leave masters at liberty to obtain and contract with seamen for voyages upon terms as to wages which they could secure by agreement, and contract with the seamen themselves. If congress deemed, as it must have done, that seamen upon ships in the coastwise trade did not require the protection which was afforded under the provisions of the act of June 7, 1872, then, certainly, for a stronger reason, seamen, *deck hands,* upon steam-boats navigating rivers, did not require such protection, and the conclusion is clear that the object and purpose of this legislation was, and is, to leave masters and seamen free to contract and be contracted with on such terms as they shall mutually agree upon, the courts being open to appeal for redress in cases of oppression and violation of contract obligations.

It is true that the seamen are called the wards of the admiralty, and in voyages to foreign ports, where much time is occupied and seamen are without the reach of courts of law to which they may apply for redress, and are compelled to submit to the will of the masters of the vessels,—in such cases there is good and strong reason why their contracts should be made under the superintendence of a shipping commissioner; but this has little application to seamen or deck hands upon steam-boats navigating our rivers, and if masters may contract with and ship their men themselves on terms mutually agreed upon, it is difficult to see why they may not employ agents or agencies on shore to aid them in obtaining and shipping crews. But the proposition is that if they employ any agents for such purpose, it must be the shipping commissioner and no other person. But such construction of the act would not be on a line with the legislation of congress upon the subject to which we have just adverted, and the present act is not a return to the stringent, and to some extent onerous, provision of the act of June 7, 1872, but, as the title to the act states, it is to remove burdens and not to impose them upon the merchant marine. To give section 10 the construction here claimed by the prosecution, would indicate a new, if not a wide, departure from the action of congress heretofore had upon the subject, which, had it been intended, would have been indicated more clearly and distinctly than we have it in the section under consideration.

The other and subsequent clauses of the section give force to this view of the subject, and show that the purpose was to afford protection to seamen on vessels bound on voyages to distant ports, where a protracted absence was in contemplation, and not to cases such as the one at bar.

The defendant, H. Clay King, is discharged.

See *The State of Maine*, 22 FED REP. 734.—[ED.